IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAMONTE BURTON ARMSTRONG,      )
                               )
              Plaintiff,       )
                               )
     v.                        )      1:15CV282
                               )
CITY OF GREENSBORO; J.F. WHITT, )
individually; DAVID SPAGNOLA,  )
individually; and SYLVESTER    )
DAUGHTRY, JR., individually and )
in his official capacity as    )
former Chief of Police of the  )
City of Greensboro,            )
                               )
              Defendants.      )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This matter comes before this court on the motion to
dismiss Plaintiff's claims filed by Defendants City of
Greensboro and Sylvester Daughtry, Jr. (Doc. 18). Defendants
City of Greensboro and Daughtry's motion was cross-referenced
and incorporated in the motions to dismiss filed by Defendant
David Spagnola (Doc. 20) and Defendant J.F. Whitt (Doc. 22)
(collectively "Defendants"). Plaintiff Lamonte Burton Armstrong
("Plaintiff") filed three responses in opposition (Docs. 26, 27,
28). Each Defendant filed replies (Docs. 31, 32, 33). Defendants
Whitt and Spagnola's motions were addressed in a previous
Memorandum Opinion and Order filed by this court on March 31,

2016 (Doc. 34), and the explanation for that denial is contained in the present Memorandum Opinion and Order. This matter is ripe for resolution and for the following reasons, this court will grant in part and deny in part Defendants' motions.[1]

## I.   BACKGROUND

### A.   Parties

Plaintiff is an individual who was previously imprisoned for a crime of which he was innocent. (Complaint ("Compl.") (Doc. 1) ¶ 1.) Defendant City of Greensboro is a municipal corporation and the Greensboro Police Department ("GPD") is a department of Defendant City of Greensboro. (Id. ¶ 10.) Defendants J.F. Whitt and David Spagnola were police detectives employed by Defendant City of Greensboro at the time of the investigation, arrest, and prosecution of Plaintiff. (Id. ¶¶ 11-12.) Defendant Sylvester Daughtry, Jr., served as the Chief of Police of Defendant City of Greensboro at that time. (Id. ¶ 13.)

### B.   Factual Allegations

The following facts are drawn from the Complaint and are presented in the light most favorable to Plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this case, because the

---

[1] Further, this court held a telephone conference with the parties on May 12, 2016, regarding the current status of this case.

Complaint is detailed and extensive in its allegations, the facts will be summarized generally and addressed more specifically in the analysis where necessary.

The underlying criminal case in this matter arose from the investigation of the murder of Ernestine Compton in July 1988. (Compl. (Doc. 1) ¶¶ 1-2.) However, in December 2011, Plaintiff filed a Motion for Appropriate Relief in the Guilford County Superior Court that, after investigation, was consented to by the Guilford County District Attorney's Office. (Id. ¶ 4.) On June 29, 2012, Plaintiff's conviction was vacated, (id. ¶ 5); on March 13, 2013, the first-degree murder charge against him was dismissed, (id. ¶ 6); and on December 23, 2013, Governor Pat McCrory granted Plaintiff a Pardon of Innocence. (Id. ¶ 7.)

### 1.   Ernestine Compton's Murder

In July 1988, Ernestine Compton was murdered in her home in Greensboro, North Carolina. (Id. ¶ 15.) Following the discovery of Compton's body, Defendant Whitt was the lead detective assigned to the investigation and was assisted by Defendant Spagnola and various other GPD officers and detectives. (Id. ¶ 18.) Plaintiff alleges that Defendant Daughtry was responsible for the establishment of policies, procedures, and customs applicable to the GPD and used by the officers and detectives during the investigation. (Id.)

-3-

### 2. **The Crime Scene Search**

The GPD collected a significant amount of forensic evidence from the crime scene and these items were preserved for future processing and analysis and turned in to the GPD Evidence Custodian. (Id. ¶ 20.) The GPD also located in the kitchen various notes written by Compton, although these notes do not appear as an entry on related evidence control forms and were not submitted to the GPD Evidence Custodian. (Id. ¶ 21.)

### 3. **Charles Blackwell Falsely Implicates Plaintiff**

News stories recounting Compton's murder include stories in the Greensboro News & Record. (Id. ¶ 22.) As Compton was well known in the black community in Greensboro at that time, the community also speculated about who might be responsible for her death. (Id. ¶ 24.) A July 26, 1988 story in the Greensboro News & Record indicated that the Governor's office, the police, and Crime Stoppers were all offering monetary awards for information about her murder. (Id. ¶ 25.) The following day, the GPD received a tip through Crime Stoppers that identified Plaintiff as a possible suspect in the murder. (Id. ¶ 26.) Plaintiff alleges that this tip came from Charles Blackwell, a street criminal who had been a GPD informant for a number of years and

was well known to Defendants Whitt and Spagnola. (Id. ¶¶ 26-28.)[2] Additionally, Plaintiff alleges that Defendants Whitt and Spagnola were aware that Blackwell was not trustworthy and that the information he provided was not reliable. (Id. ¶ 30.)

Based on the Crime Stopper's tip, Defendant Whitt spoke with Plaintiff over the telephone. (Id. ¶ 33.) Plaintiff alleges that Defendants Whitt and Spagnola did not find any evidence inconsistent with what Plaintiff said in this call. (Id.) For two weeks, Defendant Whitt interviewed other witnesses and suspects, but he received no other information implicating Plaintiff in the murder. (Id. ¶ 34.)

Plaintiff then alleges an extensive pattern of occurrences where Blackwell would speak with the detectives, provide inconsistent or non-specific information about the murder or fail to persuade Plaintiff to make incriminating statements or admissions, and nevertheless receive compensation or aid with criminal charges. (See, e.g., id. ¶¶ 35-39.) Plaintiff additionally alleges a pattern of the inconsistencies, associated recordings, or other pieces of information being withheld from the District Attorney's Office and from the Prosecution Summary prepared by Defendant Whitt. (See, e.g., id.

_____

[2] Plaintiff alleges that Blackwell frequently called Defendant Spagnola to offer information about criminal activity, in exchange for which he sought money. (Id. ¶ 28.)

¶ 38.) Further, Plaintiff alleges that the detectives would make false or coercive statements to Blackwell, to induce his statements against Plaintiff, and that these statements, as well as some inconsistencies, were not included in the Prosecution Summary. (See, e.g., ¶¶ 53-65.) Other allegations by Plaintiff recount events or testimony by other individuals that should have borne on Blackwell's credibility. (See, e.g., ¶¶ 66-67.)

In February and May 1989, the FBI reported the results of its analysis of the physical evidence from the crime scene and none of the evidence matched Plaintiff. (Id. ¶ 75.) Thus, Plaintiff alleges that only Blackwell's uncorroborated and inconsistent statements linked him to the murder. (Id. ¶ 76.) Further, between 1988 and 1994, neither Blackwell nor Plaintiff was arrested for Compton's murder. (Id.)

### 4. The GPD's Policy and Practice with Respect to Informants

Plaintiff alleges that prior to Compton's death and throughout the investigation, the GPD maintained an improper policy and practice of actively encouraging detectives to rely on information from informants without regard to whether the informants were reliable or truthful and condoned such conduct when it occurred. (Id. ¶ 78.) The GPD allegedly encouraged and condoned this custom, policy, and practice by posting or allowing to be posted a large board at the police station to

-6-

keep track of the number of informants each detective cultivated, regardless of their reliability. (Id. ¶ 79.) Detectives with the most informants had stars next to their names. (Id.)[3] Plaintiff alleges that over a number of years, this caused most, if not all, GPD detectives, including Whitt and Spagnola, to frequently use questionable informants without corroborating the information provided and that their supervisors, including Defendant Daughtry, encouraged and condoned this conduct. (Id. ¶¶ 81-82.)

In furtherance of this, Plaintiff alleges that GPD informants were given money or favorable treatment in exchange for cooperation and information, regardless of the information's accuracy, allowing informants to initiate contact with the GPD and trade false information for money. (Id. ¶ 83.) Consequently, he alleges that Defendant Daughtry knew or reasonably should have known that on a frequent basis, GPD informants were studying local newspapers for crime details, incorporating those details into stories, and then offering the stories to the GPD, (id.), and that GPD officers were improperly cultivating and employing informants. (Id. ¶ 84.) Plaintiff further alleges that

_____

[3] Plaintiff alleges that Defendants Whitt and Spagnola have admitted the existence of this practice in the years between July 1988 and August 1995. (Id. ¶ 80.)

Defendant Daughtry implemented this policy and encouraged and condoned this conduct. (Id.)

Plaintiff alleges that Defendants Whitt and Spagnola provided Blackwell with the only factual details included in his statements, despite the fact that any reasonable detective would have known that this was improper and dangerous and would cause an informant's later statements to be contaminated and unreliable. (Id. ¶ 86.)

### 5. The 1994 Investigation

Despite the lack of new evidence, Defendant Whitt decided to re-open the investigation in 1994, allegedly due to pressure to solve the crime. (Id. ¶ 88.) Blackwell was brought to the GPD and given a polygraph examination. (Id. ¶¶ 89-90.) In the pre-test interview, he said that the statements he gave in 1988 were not true and he did it because he wanted help from the officers. (Id. ¶ 90.) However, allegedly due to pressure, (id. ¶ 91), Blackwell changed course and then stated that his October 29, 1988 statement was the truth, although his new claim had some discrepancies from his prior statement. (Id. ¶ 92.) Nevertheless, Whitt did not take a new statement and instead read the October 29, 1988 statement to Blackwell and had him say that it was true. (Id. ¶¶ 93-94.)

-8-

### 6.  **Whitt and the Arrest of Plaintiff**

On April 4, 1994, Defendant Whitt obtained an arrest warrant for Plaintiff for first-degree murder in Compton's death based solely on the October 29, 1988 statement from Blackwell. (Id. ¶ 97.) Plaintiff alleges that at this time, Defendant Whitt knew Blackwell's statements were inconsistent with each other, provided for monetary benefit and favorable treatment, given under the threat of indictment, inconsistent with known facts and other witness statements, and not corroborated by independent facts. (Id. ¶ 98.) Plaintiff alleges that Defendant Whitt did not inform the magistrate who issued the arrest warrant of these facts and thus, under these circumstances, there was no probable cause. (Id. ¶¶ 99-100.)

### 7.  **Defendant Whitt and Other Informants**

Shortly after Plaintiff was charged, three other informants came forward: Timothy McCorkle, Dwight Blockem, and William Earl Davis. (Id. ¶ 101.) McCorkle wrote a letter on May 26, 1994, alleging he saw what happened; at the same time of his first contact alleging to have information, he had completed his first month of a twenty-five-year prison sentence and filed a motion for appropriate relief to shorten his sentence. (Id. ¶ 102.) When interviewed, McCorkle's story was inconsistent with the story Blackwell had recounted. (See id. ¶¶ 103-04.) Despite

-9-

these inconsistencies, the fact that McCorkle had reason to have
a strong personal bias against Plaintiff, and the timing of
McCorkle's letter and its supposed revelations, Defendant Whitt
did not follow up on these issues. (Id. ¶¶ 105-09.) The two
additional informants, Dwight Blockem and William Earl Davis,
claimed to have heard Plaintiff make incriminating statements
after his arrest in April 1994. (Id. ¶ 110.) Blockem first
claimed to have information and begged for help on August 15,
1994, following his conviction as a habitual felon, fifteen-year
sentence, and during his attempt to appeal. (Id. ¶ 111.)
Although Blockem's statement regarding what he had supposedly
heard from Plaintiff was inconsistent with Blackwell's
statements, Defendant Whitt did not further investigate his
credibility. (Id. ¶ 112.)

Davis was a regular offender and convicted criminal who
first contacted Defendant Whitt after receiving a twenty-two-
year sentence as a habitual offender for multiple offenses
involving fraud. (Id. ¶ 113.) In addition to these markers of
questionable reliability, his version of what Plaintiff said had
significant discrepancies from Blackwell's statement. (Id.
¶ 114.) Defendant Whitt again did not note the inconsistencies
or seek to resolve them. (Id. ¶¶ 115-17.)

-10-

### 8. **Pretrial Recantations**

On May 17, 1994, Blackwell wrote a letter to Plaintiff in which he admitted to lying and telling the detectives that his statements had been false and stated that the detectives pressured him to testify anyway. (Id. ¶ 119.) Blackwell also wrote to the Chair of the Criminal Justice Committee of the NAACP in Greensboro and shared the same sentiments. (Id. ¶ 120.)

### 9. **The Trial**

Plaintiff's four-day-long criminal trial was in August 1995. (Id. ¶ 121.) Eleven of the State's fifteen witnesses did not implicate Plaintiff in Compton's murder; the four witnesses who did implicate him were Blackwell, Davis, McCorkle, and Blockem. (Id. ¶¶ 121-22.) Blackwell served as the State's primary witness and was the only one to testify that he saw Plaintiff murder Compton. (Id. ¶ 123.) His version of events at trial differed from his previous statements, both in changed and new details. (See id. ¶¶ 123, 125.) However, despite being confronted on that ground, Blackwell indicated to the jury that his statement had been true and that his letters indicating that he had lied were instead attempts to get at Whitt, who had tried to threaten him some. (Id. ¶¶ 126-28.) Additionally, evidence that would have challenged Blackwell's testimony was excluded from the list Defendant Whitt read at trial that purported to be

-11-

a list of items of evidence collected at Compton's house. (Id. ¶ 124.) Additionally, notes from Compton's refrigerator were not produced at trial. (Id.)

Davis testified at trial to a version of events that was again inconsistent with Blackwell's testimony. (Id. ¶ 129.) McCorkle's testimony was inconsistent with other facts as well as with Blackwell's testimony. (Id. ¶¶ 130-32.) Blockem's trial testimony conflicted with testimony from Blackwell, McCorkle, and Davis. (Id. ¶ 133.)

Additionally, during Plaintiff's testimony in his own defense, he was accused of lying about interactions or having lack of proof, when, he alleges, Defendant Whitt had withheld such evidence from the District Attorney's Office and misrepresented that fact while on the stand. (Id. ¶¶ 136-38.)

### 10. <u>Defendant Whitt and the Issue of Brady and Giglio Material Prior to and During Plaintiff's Trial</u>

Plaintiff specifically alleges that Defendant Whitt possessed evidence favorable to Plaintiff that could impeach testimony by the State's witnesses but he did not provide this evidence to the District Attorney, mention it in the Prosecution Summary, or say anything during the inconsistent testimony that occurred at trial. (Id. ¶¶ 139-41.)

### 11.  **Post-Trial Recantations**

On August 21, 1995, Blockem wrote a letter to Plaintiff's attorney stating that he was not truthful at Plaintiff's trial, supporting Blackwell's earlier claim when he admitted he was not telling the truth, apologizing to Plaintiff, and claiming that Defendant Whitt nevertheless forced him to testify. (Id. ¶ 142.) Blockem also said that Defendant Whitt made him a promise on the morning of his testimony to get him to testify. (Id.) Similarly, in March 1996, McCorkle wrote Plaintiff a letter indicating that he knew that others who testified were lying. (Id. ¶ 143.) Years later, in May 2010, Blackwell said that he called in the original tip for monetary gain and had lied at trial, even though the detectives knew he was lying and provided him with information about the murder and the crime scene, as they threatened him if he refused to testify. (Id. ¶¶ 144-48.)

### 12.  **Additional Potential Suspect**

Plaintiff further alleges that another likely suspect, Christopher Bernard Caviness, was never interviewed about this murder. (Id. ¶¶ 149-53 (noting that Caviness later pled guilty to his father's robbery and murder).) Later-analyzed physical evidence, after Plaintiff's Motion for Appropriate Relief, tied Caviness to the Compton murder scene. (Id. ¶¶ 154-55.)

-13-

## II.  **LEGAL STANDARD**

To survive a motion to dismiss, Plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). A court must accept a complaint's factual allegations as true when ruling on a Rule 12(b)(6) motion. Id. Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted).

Nevertheless, sufficient factual allegations must "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570 (citation omitted); see Iqbal, 556 U.S. at 680-81. A court "cannot ignore a clear failure in the pleadings to allege any facts which set forth a claim." Estate of Williams-Moore, 335 F. Supp. 2d at 646. Consequently, even

given the deferential standard allocated to pleadings at the motion to dismiss stage, a court will not accept mere legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).

## III. ANALYSIS

### A. Release[4]

On December 23, 2013, Governor Pat McCrory granted Plaintiff a pardon of innocence. (Compl. (Doc. 1) ¶ 7.) Defendants contend that Plaintiff thereafter made a claim in the North Carolina Industrial Commission and received an award of compensation. (See Br. in Supp. of Defs. City of Greensboro and Sylvester Daughtry, Jr.'s Mot. to Dismiss ("Greensboro and Daughtry's Br.") (Doc. 19) at 9; Ex. A (Doc. 19-1) at 2.)[5] Defendants further contend that Plaintiff simultaneously signed a release, (see Greensboro and Daughtry's Br. (Doc. 19) at 9; Ex. B (Doc. 19-2) at 2), and that this release extinguishes

---

[4] On March 31, 2016, this court issued a Memorandum Opinion and Order addressing Defendants Spagnola and Whitt's Motions to Dismiss (Docs. 20, 22). That Opinion and Order incorporated the reasoning with respect to the release analysis set forth in this Memorandum Opinion and Order.

[5] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

-15-

Plaintiff's claims here. (Greensboro and Daughtry's Br. (Doc. 19) at 9.) Plaintiff, in responding, contends that the release is not supported by consideration, is not equitable, and does not apply to the City of Greensboro. (See Pl.'s Resp. in Opp'n to Defs. Whitt, Spagnola, Daughtry and City of Greensboro's Mots. to Dismiss all Counts (Doc. 26) at 4-13.)

Plaintiff further argues that the release "at most constitutes an affirmative defense, the applicability of which should be resolved only after discovery is completed." (Id. at 15.) Defendants contend that the Complaint, by alleging the pardon of innocence, sufficiently raises the inference of a statutory remedy through the North Carolina Industrial Commission for wrongful imprisonment. (Greensboro and Daughtry's Br. (Doc. 19) at 9 n.4.) However, substantive and procedural relief that may have been received is not raised in the Complaint. (See generally Compl. (Doc. 1).) For the following reasons, this court will not consider the release, (Greensboro and Daughtry's Br., Ex. B (Doc. 19-2)), when ruling on the motions to dismiss.

"An affirmative defense is the '"defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true."'" Emergency One, Inc. v. Am. Fire Eagle

-16-

<u>Engine Co.</u>, 332 F.3d 264, 271 (4th Cir. 2003) (citation omitted). Federal Rule of Civil Procedure 8(c) provides generally, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]" Fed. R. Civ. P. 8(c)(1).

"Because the burden of establishing an affirmative defense rests on the defendant asserting it, a motion under Rule 12(b)(6) . . . is generally not the appropriate vehicle to mount such a challenge." <u>McQuade v. Xerox Corp.</u>, No. 5:10-CV-149-FL, 2011 WL 344091, at *3 (E.D.N.C. Feb. 1, 2011) (citation omitted). However, the Fourth Circuit has held that

> in the relatively rare circumstances where facts
> sufficient to rule on an affirmative defense are
> alleged in the complaint, the defense may be reached
> by a motion to dismiss filed under Rule 12(b)(6). This
> principle only applies, however, if all facts
> necessary to the affirmative defense "clearly appear[]
> <u>on the face of the complaint</u>."

<u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (alteration in original) (citations omitted) (addressing the affirmative defense of a claim being time-barred).

Because "the defense may be reached by a motion to dismiss" in rare circumstances, <u>id.</u>, if those circumstances are met, a defendant need not file defenses in the answer. Rather, in those circumstances, a defendant can raise the defense in his motion to dismiss. The defense can only be raised in a motion to

-17-

dismiss, however, if a complaint contains all facts necessary to
the defense. See id. (citation omitted); see also Brooks v. City
of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996) (citations
omitted); Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,
4 F.3d 244, 250 (4th Cir. 1993) (citations omitted); GGNSC
Morgantown, LLC v. Phillips, No. 1:14CV118, 2014 WL 5449674, at
*3 (N.D. W. Va. Oct. 24, 2014) (citations omitted). "In other
words, in order to grant a motion to dismiss alleging an
affirmative defense, the complaint must be self-defeating."
Zander v. Saxon Mortg. Serv., Inc., 1:13CV1141, 2014 WL 4246156,
at *2 (M.D.N.C. Aug. 26, 2014) (citation omitted), aff'd, 599 F.
App'x 521 (4th Cir. 2015).

McQuade v. Xerox Corp., No. 5:10-CV-149-FL, 2011 WL 344091
(E.D.N.C. Feb. 1, 2011), applied a release pled as an
affirmative defense, after emphasizing that it fell into the
"relatively rare circumstances" where the affirmative defense
could be considered at this stage. Id. at *3 (detailing how Rule
12(c) motions, as at issue there, have the same standards as
Rule 12(b)(6) motions for those purposes). McQuade fell into
those rare circumstances, as both the plaintiff's complaint and
the defendant's counterclaim and answer referenced the release.
Id. This difference places McQuade in stark contrast to the
Complaint in this case, which both fails to mention the release

-18-

in any way[6] and fails to provide sufficient facts for this court to address the affirmative defense.

Further, and of particular note to this court is the fact that the release states that the released parties are "the State of North Carolina, its officers, employees, servants and agents . . . ." (Greensboro and Daughtry's Br., Ex. B (Doc. 19-2) at 2.) The Defendants in this case are identified in the Complaint as the "City of Greensboro[,] . . . a municipal corporation," (Compl. (Doc. 1) ¶ 10), "a department of the defendant City of Greensboro[,]" a municipal corporation, (id.), employees of the City of Greensboro, (see id. ¶¶ 11-12), and a "policymaker for the City of Greensboro[,]" (id. ¶ 13). It is not apparent from the face of the Complaint how these Defendants would be included within the language of the release agreement. Defendants' arguments as to the intent of the parties for the release as reflected in the language of other releases, (see Reply Br. in Supp. of Defs. City of Greensboro and Sylvester Daughtry, Jr.'s Mot. to Dismiss ("Greensboro and Daughtry's Reply Br.") (Doc. 32) at 12), are not persuasive at this stage of the proceedings.

---

[6] Defendants argue that the Complaint does allege the pardon of innocence, which established Plaintiff's eligibility for the North Carolina Industrial Commission process, from which the release arose. (Greensboro and Daughtry's Br. (Doc. 19) at 9 n.4 (citations omitted).) Such an inferential basis does not satisfy the standard set out by the Fourth Circuit requiring "all facts necessary" to be "on the face of the complaint." Goodman, 494 F.3d at 464 (citations omitted).

It may be that the release is determined to be controlling as a matter of law at summary judgment, but construction of the language of the contract will be required, as the contract language does not sufficiently identify the City of Greensboro and its employees as released parties on the record currently before this court.

Thus, as this is an affirmative contractual defense, this court does not find a Rule 12(b)(6) dismissal to be appropriate. To the extent Defendants' motion to dismiss is predicated on the release, the motion will be denied.

## B.   <u>Counts III and IV: Claims against Defendant Daughtry in his Official Capacity</u>

In their joint motion to dismiss, Defendants City of Greensboro and Daughtry move to dismiss the official capacity claims against Defendant Daughtry as duplicative of the claims against Defendant City of Greensboro. (Defs. City of Greensboro and Sylvester Daughtry, Jr.'s Mot. to Dismiss (Doc. 18) at 2; Greensboro and Daughtry's Br. (Doc. 19) at 13.) Specifically, Defendants assert that "a '§ 1983 claim against [Daughtry] in his official capacity as [Chief of Police] is essentially a claim against the [City] and thus should be dismissed as duplicative[,]' . . . [and because] [t]he official capacity part of Count III is essentially duplicative of Count IV," both claims against Defendant Daughtry in his official capacity

-20-

should be dismissed. (Greensboro and Daughtry's Br. (Doc. 19) at 13 (citation omitted).)

Plaintiff concedes that Count III was only intended to be against Defendant Daughtry in his individual capacity. (Pl.'s Resp. to Defs.' Mot. to Dismiss the Claim against Def. Spagnola for Concealing Exculpatory and Impeachment Evidence and the Official Capacity Claim against Def. Daughtry (Doc. 28) at 2.) However, Plaintiff argues that Count IV "alleges that defendant Daughtry had final policymaking authority . . . with regard to law enforcement matters, and sets out an 'official capacity' claim[.]" (Id.) He argues that the fact that the City could be liable for Defendant Daughtry's conduct in his official capacity does not justify dismissal at this point and "will in no way affect discovery," instead advocating to reserve this matter for when it is submitted to a jury. (Id. at 3.) Defendants reply asserting that "[t]he law is clear that Section 1983 claims against an employee in his . . . official capacity are duplicative of claims against the employer and therefore subject to dismissal." (Greensboro and Daughtry's Reply Br. (Doc. 32) at 14 (citations omitted).) They also assert that "Plaintiff cites no authority contrary to Love-Lane." (Id.)

In Love-Lane v. Martin, 355 F.3d 766 (4th Cir. 2004), the Fourth Circuit affirmed the district court in part, holding that

it "correctly held that the § 1983 claim against [the defendant]
in his official capacity as Superintendent is essentially a
claim against the Board[,] [also a defendant,] and thus should
be dismissed as duplicative." Id. at 783 (citations omitted). In
support, the Fourth Circuit cited Kentucky v. Graham, 473 U.S.
159 (1985), which held that

> [o]fficial-capacity suits . . . "generally represent
> only another way of pleading an action against an
> entity of which an officer is an agent." As long as
> the government entity receives notice and an
> opportunity to respond, an official-capacity suit is,
> in all respects other than name, to be treated as a
> suit against the entity.

Id. at 165-66 (citations omitted) (discussing in context of the
question of who damages can be sought from). Further, the court
observed that "[t]here is no longer a need to bring official-
capacity actions against local government officials, for under
Monell, local government units can be sued directly for damages
and injunctive or declaratory relief." Id. at 167 n.14
(citations omitted). In applying this determination, Hicks v.
Halifax Cty. Bd. of Educ., 93 F. Supp. 2d 649 (E.D.N.C. 1999),
dismissed official capacity claims that were identical to a
claim against the entity, holding that it was "unnecessary for
plaintiff to proceed against both the officials in their
official capacities and the School Board under Kentucky and

Monell," leaving only the individual capacity claims or claims against the Board to proceed in the suit. Id. at 667-68.

Thus, duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed. See W.E.T. v. Mitchell, No. 1:06CV487, 2007 WL 2712924, at *10 (M.D.N.C. Sept. 14, 2007); Locklear v. Person Cty. Bd. of Educ., No. 1:05CV00255, 2006 WL 1743460, at *13 (M.D.N.C. June 22, 2006); Sheaffer v. Cty. of Chatham, 337 F. Supp. 2d 709, 721 (M.D.N.C. 2004); see also Fields v. Tucker, No. 1:10CV844, 2011 WL 4345306, at *3 (M.D.N.C. Sept. 15, 2011) (cited by Defendants) (recommending that duplicative official capacity claims be dismissed).

Given this precedent and noting that Count IV is against both the City of Greensboro and Defendant Daughtry in his official capacity, (Compl. (Doc. 1) at 58), and given Plaintiff's concession that including Defendant Daughtry in his official capacity in Count III was a drafting error, this court will dismiss Counts III and IV against Defendant Daughtry in his official capacity.

C.  **Count III against Defendant Daughtry in his Individual Capacity**

-23-

### 1. __Factual Allegations Specific to Counts III and IV__

Plaintiff's allegations against Defendant Daughtry incorporate the informant policy allegations. (Compl. (Doc. 1) ¶ 194.) Further, for Count III, Plaintiff specifically alleges that Defendant Daughtry failed to adequately train, supervise, and discipline GPD detectives or failed to ensure that adequate training, supervision, and discipline were provided by direct supervisors regarding both how to use informants and how to disclose exculpatory and impeachment material. (Id. ¶ 196.) Plaintiff additionally alleges that Daughtry failed to ensure reasonable behavior and proper use of informants and disclosure of evidence during this case and that this failure to adequately train, supervise, and discipline Defendants amounted to gross indifference or intentional misconduct that directly caused violations of Plaintiff's constitutional rights and other injuries. (Id. ¶¶ 197-203.)

As to Count IV, Plaintiff specifically alleges that Daughtry had final policymaking authority for GPD and the City of Greensboro with respect to law enforcement and criminal investigations and that he knew or reasonably should have known about the detectives' pattern and practice of fabricating and concealing evidence via systemic disregard of proper and accepted practices and procedures. (Id. ¶¶ 205-06.) He alleges

-24-

further that Defendant Daughtry agreed to, approved, condoned, or ratified this policy and custom of acting against general practices and causing violations of Plaintiff's constitutional rights and other damages. (Id. ¶¶ 207-212.)

### 2.  **Arguments and Analysis**

Defendants City of Greensboro and Daughtry argue that Plaintiff's direct and supervisory liability allegations are merely conclusory and lack sufficient factual matter to survive a Rule 12(b)(6) motion. (Greensboro and Daughtry's Reply Br. (Doc. 32) at 15-18.) They also argue for dismissal based on qualified immunity, asserting Plaintiff failed to plead sufficiently that Daughtry deprived him of his "clearly established constitutional rights." (Greensboro and Daughtry's Br. (Doc. 19) at 17 (citation omitted).)

Plaintiff asserts that both individual direct liability and supervisory liability are alleged sufficiently. (Pl.'s Resp. in Opp'n to Defs. Daughtry and City of Greensboro's Mots. to Dismiss Counts III and IV ("Pl.'s Resp. to Counts III and IV") (Doc. 27) at 8-11.) He seeks to distinguish his Complaint from that at issue in Safford v. Barnes, No. 1:14cv267, 2014 WL 5819380 (M.D.N.C. Nov. 10, 2014), which Defendants rely on for support, (see Greensboro and Daughtry's Br. (Doc. 19) at 17-20). (Pl.'s Resp. to Counts III and IV (Doc. 27) at 5-8.) Plaintiff

-25-

argues that the individual acts subjecting Defendant Daughtry to direct liability include allegations that he encouraged the detectives to use informants improperly and that this encouragement ultimately led to Plaintiff's constitutional injury. (Id. at 9.)

Defendants argue that "[t]here are no allegations of actual involvement by Daughtry in the investigation of Plaintiff" and instead "[t]he allegations of insufficient supervision, discipline, and training are, in essence, allegations of supervisory liability." (Greensboro and Daughtry's Br. (Doc. 19) at 17 (citation omitted)). They also argue that "Plaintiff has not alleged any conduct by Daughtry that deprived Plaintiff of a constitutional right" and "[t]he only allegations connecting Daughtry to the . . . investigation are that he was the Chief of Police at the time and signed a cover letter to the FBI in connection with a request for examination of forensic evidence." (Greensboro and Daughtry's Reply Br. (Doc. 32) at 15-16.)

To prevail on a direct liability theory, Plaintiff must "establish that [Defendant] committed a <u>direct</u> violation of [his] constitutional rights." <u>Mandsager v. Univ. of N.C. at Greensboro</u>, 269 F. Supp. 2d 662, 679 (M.D.N.C. 2003). Individual liability of a supervisor "is a noted exception to the rule that a 'supervisor is not liable under section 1983 unless an

-26-

affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.'" <u>Cranford v. Frick</u>, No. 1:05CV00062, 2007 WL 676687, at *6 (M.D.N.C. Feb. 28, 2007) (alteration in original) (citation omitted).

As an example, in <u>Cranford v. Frick</u>, No. 1:05CV00062, 2007 WL 676687 (M.D.N.C. Feb. 28, 2007), a plaintiff sought to hold the defendant sheriff individually liable based on his "own conduct of assisting the officers' unconstitutional mistreatment of her." <u>Id.</u> at *6. There, the sheriff allegedly communicated by phone with the officers and gave specific directions. <u>Id.</u> at *2. Consequently, "[i]f the basis of a complaint involves an accusation that a supervisor participated in the wrongful conduct, . . . a plaintiff may claim that the supervisor was personally involved in that conduct and liable for either tacitly authorizing the conduct or through the supervisor's own affirmative misconduct." <u>Id.</u> at *5 (citations omitted).

Personal involvement and affirmative misconduct or tacit authorization are necessary to establish the direct liability of a supervisor. Section 1983 liability does not arise "for mere negligence, or even gross negligence in 'failing to detect and prevent subordinates' misconduct.' Instead, a supervisor 'must know about the conduct and facilitate it, approve it, condone

-27-

it, or turn a blind eye . . . .'" Id. (citations omitted)
(observing that this element is required "because it is the
'supervisor's participation in wrongdoing [that] will trigger
liability'" (citation omitted)).

Consequently, in Goodwin v. Beasley, No. 1:09CV151, 2010 WL
2539795 (M.D.N.C. June 18, 2010), adopted as modified by 2011 WL
238640 (M.D.N.C. Jan. 24, 2011), a plaintiff's individual
capacity claim against a sheriff survived a motion to dismiss
given allegations that he "failed to 'enforce basic policies and
procedures along with not having properly trained deputies or
Jailers . . . '" and "'fail[ed] to train and enforc[e] jailhouse
screening policy and the training of [a specific] jailer . . .
.'" Id. at *10 (citations omitted) (noting he could not be held
vicariously liable under a respondeat superior theory but could
"be held liable to the extent that an affirmative link exists
between his 'participation, his exercise of control or

direction, or his failure to supervise' and the alleged constitutional deprivation" (citation omitted)).[7]

As a contrast, however, Safford v. Barnes addressed liability in the context of a § 1983 claim. There, the plaintiff asserted that the defendant, "in his individual capacity — failed to properly hire, train, educate, and supervise deputies under § 1983." 2014 WL 5819380, at *5. However, the court classified his allegations as, "[i]n essence, . . . seek[ing] to impose supervisory liability on" the defendant and proceeded with a supervisory liability analysis. Id. at *5-6 (citations omitted).

---

[7] In Spell v. McDaniel, 591 F. Supp. 1090 (E.D.N.C. 1984), however, a plaintiff alleged that "defendants [we]re directly liable [under § 1983] through reckless and deliberate breach of their basic duties to properly train, supervise, investigate and discipline their subordinates." Id. at 1110 (citation omitted). As far as causation, "[u]nder direct liability, plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." Id. (citation omitted). "Personal participation is not a necessary prerequisite"; rather,

> [t]he requisite causal connection can be established not only by direct personal participation, but also by failure to perform an act which is legally required or by "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."

Id. (citations omitted). Spell ruled on a motion to dismiss many years prior to Twombly and Iqbal. In the end, the court rejected the argument that the allegation of "breach of their basic duties to properly train, supervise, investigate and discipline" constituted "a disguised respondeat superior claim." Id. at 1109-10.

Plaintiff's specific allegations focus on Defendant Daughtry's role overseeing the GPD and Defendants Whitt and Spagnola in particular. Here, there is no allegation that Defendant Daughtry was involved specifically in or around the particular misconduct alleged against Plaintiff. The allegations are only that he generally encouraged them to use questionable informants – something that appears to have applied to the entire department. (See Compl. (Doc. 1) ¶¶ 78-79, 81, 84.) Instead, the allegations specifically included under Count III (in contrast to those incorporated via ¶ 194 of the Complaint) all focus on the lack of adequate training, supervision, and discipline — omissions on a departmental level, rather than specifically with Defendants Whitt and Spagnola or this investigation — and not on individual actions. Indeed, Count III is entitled "42 U.S.C. § 1983 Claim For Failing to Establish a Constitutionally Adequate Regime of <u>Training, Supervision and/or Discipline</u> Regarding the Appropriate Use of Informants and the Production of Brady and Giglio Material to Prosecutors." (<u>Id.</u> at 56 (emphasis added).) Plaintiff merely points to Defendant Daughtry's "encouragement" as the individual act, relying on "reasonable inferences" to support direct liability for implementing a policy and encouraging officers to use

questionable informants. (See Pl.'s Resp. to Counts III and IV (Doc. 27) at 9.)

While Plaintiff seeks to distinguish his case from Safford in part by emphasizing the difference in volume of allegedly unlawful behavior in his Complaint and in the Safford complaint, (see id. at 5-8), this contrast does not sufficiently distinguish his direct liability claim against Defendant Daughtry from the supervisory claim in Safford. Specifically, Plaintiff's direct liability claim emphasizes Defendant Daughtry's training, supervising, and disciplinary roles and he cites to prior allegations of "encouragement" of the police officers. (Id. at 8-9; Compl. (Doc. 1) ¶¶ 194-203.) However, the Safford allegations are sufficiently similar, as they focused on alleged inaction, lack of knowledge of prior misconduct, and did not articulate instructions or other actions by the supervisor causing the subordinate's actions against the plaintiff. Safford, 2014 WL 5819380, at *6.

Plaintiff's supervisory liability claim is discussed infra, but, for direct liability, Defendant Daughtry must have done something that draws a sufficient link between his actions and the constitutional injury to hold him directly and individually liable. Even Goodwin required "an affirmative link." Goodwin, 2010 WL 2539795, at *10 (citation omitted). According all

reasonable inferences to Plaintiff, the Complaint fails to plausibly allege Defendant Daughtry's direct liability. Mere allegations about the environment or generalized encouragement do not rise to the level of alleging a direct connection between Defendant Daughtry and the constitutional violations.[8] Thus, the bare allegations fail to establish a sufficiently plausible connection to allege direct liability.

Plaintiff and Defendants also address the question of Defendant Daughtry's supervisory liability under § 1983. Despite limits on supervisory liability in § 1983 actions, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates . . . . premised upon . . . 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted).

To establish supervisory liability under § 1983, a plaintiff must show:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct

---

[8] This conclusion is further supported by Plaintiff's own Complaint, given the title and focus for Count III. (Compl. (Doc. 1) at 56 (alleging liability "For Failing to Establish a Constitutionally Adequate Regime of Training, Supervision, and/or Discipline . . . .").)

> that posed "a pervasive and unreasonable risk" of
> constitutional injury to citizens like the plaintiff;
> (2) that the supervisor's response to that knowledge
> was so inadequate as to show "deliberate indifference
> to or tacit authorization of the alleged offensive
> practices,"; and (3) that there was an "affirmative
> causal link" between the supervisor's inaction and the
> particular constitutional injury suffered by the
> plaintiff.

Id. at 799 (citations omitted); see also Wilkins v. Montgomery,

751 F.3d 214, 226 (4th Cir. 2014). Further, "[a]lthough not

specifically mentioned in this articulation of the standard, a

supervisor's failure to train his employees can subject him to

liability where the failure to train reflects a 'deliberate

indifference' to the rights of citizens." Layman v. Alexander,

294 F. Supp. 2d 784, 793-94 (W.D.N.C. 2003) (citations omitted).

    To establish the first element of actual or constructive

knowledge, "a plaintiff must show the following: (1) the

supervisor's knowledge of (2) conduct engaged in by a

subordinate (3) where the conduct poses a pervasive and

unreasonable risk of constitutional injury to the plaintiff."

Shaw, 13 F.3d at 799 (citation omitted). The third sub-element

of risk "requires evidence that the conduct is widespread, or at

least has been used on several different occasions and that the

conduct engaged in by the subordinate poses an unreasonable risk

of harm of constitutional injury." Id. (emphasis added)

(citation omitted).

Case 1:15-cv-00282-WO-JEP   Document 46   Filed 06/06/16   Page 33 of 61

Greene v. County of Durham Office of the Sheriff

Department, No. 1:14-CV-153, 2014 WL 5465371 (M.D.N.C. Oct. 28, 2014), reviewed, among other claims, a supervisory liability claim under § 1983 under a motion for failure to state a claim. Id. at *2. There, the complaint alleged "that 'the Sheriff, and the office of the sheriff . . . knew or should have known of the patterns, and common practices of wrongs that its employees/defs. have been committing, yet failed, refused, and deliberately turned its' heads to correct the same . . . .'" Id. (citation omitted). It also alleged "that 'the mentioned acts/wrongs are not isolated ones, and are acts that the defs. are continuously committing, and were brought to the attention of the Sheriff (Hill) . . . to no avail . . . .'" Id. (citation omitted). In its analysis, the court specifically noted that the plaintiff "does not mention any other specific incident preceding the events at issue, much less any incident that involved the same detention officers and of which the [defendant] was aware." Id. (citations omitted). Based on these insufficiencies, the court concluded that the "allegations of pervasive misconduct" were "conclusory and insufficient to state a claim." Id. (citation omitted). Thus, the absence of a pattern of factual, rather than conclusory, allegations, will fail to support the knowledge element.

To establish the second element, a plaintiff must allege either tacit authorization or deliberate indifference. A "heavy burden" is required to prove deliberate indifference, requiring a plaintiff to "demonstrat[e] a supervisor's 'continued inaction in the face of documented widespread abuses.'" Shaw, 13 F.3d at 799 (citations omitted); see also Mikkelsen v. DeWitt, 141 F. App'x 88, 91-92 (4th Cir. 2005) ("Deliberate indifference is a very high standard — a showing of mere negligence will not meet it." (citation omitted)). Thus, "[a]ctions that in hindsight are 'unfortunate' or even 'imprudent' will not suffice." Baynard v. Malone, 268 F.3d 228, 236 (4th Cir. 2001) (citation omitted).

For this second element, the Fourth Circuit has determined that

> [o]rdinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . . Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (citations omitted).

In contrast, the plaintiffs in <u>Shaw v. Stroud</u>, 13 F.3d 791 (4th Cir. 1994), "presented more than an isolated incident suggesting [the defendant's] deliberate indifference to or implicit authorization of . . . abusive conduct" where "separate witnesses . . . alleged that, when they notified [the defendant] of assaults . . . he responded callously and with apparent amusement." <u>Id.</u> at 800. While this level of explicit indifference does not appear to be a requirement, the cases make clear that allegations of widespread abuses or a pattern of violations ordinarily are sufficient allegations to establish the second element.

Finally, to establish the third element, a plaintiff must "demonstrate[] an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff[,]" either through "cause in fact [or] proximate caus[ation]." <u>Id.</u> at 799 (citations omitted).

As to the first element, Plaintiff alleges that detectives frequently engaged in questionable informant practices and that the "supervisors, including defendant Daughtry, encouraged and condoned this conduct, which most, if not all, GPD detectives engaged in on multiple occasions over a number of years." (Compl. (Doc. 1) ¶ 81.) He also alleges that Defendant Daughtry "knew or reasonably should have known" that these questionable

-36-

informant tactics occurred "on a frequent basis." (Id. ¶ 83.)
Defendants counter that "Plaintiff has made only broad,
conclusory allegations" and that he failed to "allege that
Daughtry had knowledge of the type of misconduct at issue."
(Greensboro and Daughtry's Br. (Doc. 19) at 18-19 (citations
omitted).)

Plaintiff does allege general facts about the cultivation
of informants and that Daughtry either knew or reasonably should
have known about these practices. (Compl. (Doc. 1) ¶ 83.)
However, Plaintiff fails to allege facts sufficient to show a
widespread pattern or practice from which to derive Defendant
Daughtry's liability here. Specifically, Plaintiff only alleges
one instance of the alleged pattern leading to a constitutional
violation and wrongful conviction – the events at issue in his
own case. There are no other sufficiently specific allegations
of any other particular behavior (rather than broad allegations
of a general practice) that would provide the foundation for
knowledge, actual or constructive, as to other instances of
constitutional violations or, more significantly, wrongful
convictions arising from this conduct. Thus, Plaintiff fails to
allege facts to draw the necessary connection to hold Defendant
Daughtry liable.

-37-

Plaintiff also fails to allege sufficiently the second
element of inadequate response and deliberate indifference. In
Safford, the plaintiff failed to allege sufficiently deliberate
indifference where "there [we]re simply no allegations of
documented abuse." 2014 WL 5819380, at *6 (citations omitted).
In Willis v. Blevins, 966 F. Supp. 2d 646 (E.D. Va. 2013), one
alleged, particular incident of "two officers fabricat[ing]
documents" that did not implicate the defendant was deemed
insufficient to meet the documented abuse standard. Id. at 663.
Similarly to these cases, Plaintiff provides conclusory
allegations of abuse rather than "continued inaction in the face
of documented widespread abuses." See Shaw, 13 F.3d at 799
(citation omitted). While the Complaint alleges abuse relevant
to the informants in his case, (Compl. (Doc. 1) ¶¶ 19-99), there
is no indication of any prior or documented abuse. The
allegations surround the cultivation of informants but do not
give any detail as to a pattern of how they were actually used
and how that use played into the alleged constitutional
injuries: Brady and Giglio violations. (Id. at 56.) While
Plaintiff alleges that indifference or encouragement led to his
specific constitutional injuries, there is no indication of a
broader pattern of constitutional injuries occurring.

Because Plaintiff fails to allege sufficiently the first two predicate elements, it follows that there can be no causation. Thus, Plaintiff's Complaint, while filled with conclusory allegations, has no factual allegation connecting the facts regarding the informant cultivation process, (see Compl. (Doc. 1) ¶ 83), and their alleged use in investigations and prosecutions, (see id. ¶ 84), beyond Plaintiff's case. This absence results in a failure to allege sufficiently supervisory liability against Defendant Daughtry in his individual capacity.

Further, Defendants contend that Defendant Daughtry is protected from liability for the individual capacity claim against him in Count III through the doctrine of qualified immunity. (Greensboro and Daughtry's Br. (Doc. 19) at 17.)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted); see also Kirby v. City of Elizabeth City, 388 F.3d 440, 450 (4th Cir. 2004) ("Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"
(citation omitted)). Further, this "protection . . . applies
regardless of whether the government official's error is 'a
mistake of law, a mistake of fact, or a mistake based on mixed
questions of law and fact.'" Pearson, 555 U.S. at 231 (citation
omitted); see also Hunter v. Bryant, 502 U.S. 224, 229 (1991)
("The qualified immunity standard 'gives ample room for mistaken
judgments' by protecting 'all but the plainly incompetent or
those who knowingly violate the law.'" (citation omitted)).

The timing of a determination of qualified immunity is also
significant: "[B]ecause '[t]he entitlement is an immunity from
suit rather than a mere defense to liability,' we repeatedly
have stressed the importance of resolving immunity questions at
the earliest possible stage in litigation." Hunter, 502 U.S. at
227 (citations omitted). Indeed, "the purpose of qualified
immunity is to remove most civil liability actions, except those
where the official clearly broke the law, from the legal process
well in advance of the submission of facts to a jury." Slattery
v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (citation omitted);
see also Gooden v. Howard Cty., 954 F.2d 960, 965 (4th Cir.
1992) ("[T]he basic purpose of qualified immunity . . . is to
spare individual officials the burdens and uncertainties of
standing trial in those instances where their conduct would

-40-

strike an objective observer as falling within the range of
reasonable judgment." (citation omitted)).

Elaboration as to the second prong establishes that the
"focus must be narrower, as the determination of whether a given
right was clearly established requires us to define that right
'at a high level of particularity.'" Campbell v. Galloway, 483
F.3d 258, 271 (4th Cir. 2007) (citation omitted).[9] However,

> [t]o ring the "clearly established' bell, there need
> not exist a case on all fours with the facts at hand .
> . . . [as] 'the nonexistence of a case holding the
> defendant's identical conduct to be unlawful does not
> prevent the denial of qualified immunity." "Rather,
> the unlawfulness must be apparent in light of pre-
> existing law."

Hunter v. Town of Mocksville, 789 F.3d 389, 401 (4th Cir. 2015),

cert. denied, ____ U.S. ____, 136 S. Ct. 897 (2016) (citations

omitted). In sum, as articulated by the Fourth Circuit in the

context of a police officer: "A police officer should prevail on

an assertion of qualified immunity if a reasonable officer

possessing the same information could have believed that his

---

[9] For purposes of illustration, in Campbell v. Galloway, 483
F.3d 258 (4th Cir. 2007), the Fourth Circuit determined that
instead of the broad legal principle applicable to the case –
"that public employees may not be fired on a basis that
infringes on their First Amendment rights" – the proper inquiry,
defined at the more particular level, was "whether a reasonable
officer would have known that Campbell's rambling thirteen-page
memo to Chief Galloway, which focused overwhelmingly on personal
grievances and vague gripes about fellow officers not being very
nice to her, touched on a matter of public concern, thus
entitling Campbell to the protection of the First Amendment."
Id. at 271.

conduct was lawful." Slattery, 939 F.2d at 216 (citation
omitted).

In assessing the two prongs of the qualified immunity
analysis, it is in the district court's discretion to decide
which prong to address first, "in light of the circumstances in
the particular case at hand." Pearson, 555 U.S. at 236. This
loosened the rigidity of the Saucier protocol set forth in
Saucier v. Katz, 533 U.S. 194 (2001), which the Supreme Court
held that a district court must consider: (1) "Taken in the
light most favorable to the party asserting the injury, do the
facts show the officer's conduct violated a constitutional
right?" and (2) if so, was that right clearly established? Id.
at 201 (citation omitted). For the second prong, "[a] right is
clearly established if the contours of the right are
sufficiently clear so that a reasonable officer would have
understood . . . that his behavior violated the right."
Campbell, 483 F.3d at 271 (citation omitted).

Donaggio v. Arlington Cty., 880 F. Supp. 446 (E.D. Va.
1995), addressed, in part, a police chief's eligibility for
qualified immunity. There, the plaintiff police officer, as a
result of initial miscommunications, volunteered to do overtime
at an event, only to later learn that it involved showing
support for assault weapons legislation. Id. at 451. Upon

seeking to withdraw, due to their opposition to the legislation, the plaintiff and some others were told that they were now required to attend unless they found replacements and that failure to attend could result in disciplinary actions. Id. Following the event, a taxpayer filed a civil suit alleging unlawful expenditure of county funds because the officers were paid overtime wages for attending this event. Id. at 452. As to the chief's role in the events that unfolded, he had "agreed to send a group of police officers to the event at the Capitol, and authorized payment of overtime wages to them. He intended the detail to be staffed with officers who volunteered and were willing participants, although he did nothing to ensure that the detail was carried out as he expected." Id. at 463. The court determined that "[i]n these circumstances, even if this conduct violated someone's constitutional rights, a reasonably competent police chief could not be faulted for being unaware of the violation." Id. at 463.

Donaggio provides a useful parallel to the issue of Brady and Giglio violations raised in the case at hand. Plaintiff's allegations against Defendant Daughtry with respect to these alleged violations is that he failed to properly train, supervise, or discipline detectives with respect to "the full and complete disclosure of all exculpatory and impeachment

-43-

material to prosecutors" and that he "failed to ensure that GPD detectives . . . disclosed exculpatory evidence discovered during their investigation to the District Attorney so that such information would be disclosed to Armstrong's defense counsel, as required by law." (Compl. (Doc. 1) ¶¶ 196, 200.) However, while Plaintiff makes allegations, discussed supra, regarding the GPD's actual practices regarding informants and a potential department-wide policy of encouraging questionable practices, via a large board tracking informants regardless of credibility, similar allegations do not exist with respect to Brady and Giglio concerns. Plaintiff does allege Defendant Whitt's behavior resulted in serious Brady and Giglio violations against him, (see Compl. (Doc. 1) ¶¶ 139-41), however, Plaintiff does not sufficiently allege improper disclosure of information as occurring on a wide scale and thus he fails to sufficiently allege, beyond a conclusory level, that Defendant Daughtry should have known about it and that he carried responsibility for these violations. There are only cursory allegations that Defendant Daughtry generally failed to train the detectives and to ensure that they acted properly. However, there are no factual allegations as to how he should have known about these violations; similar to the police chief in Donaggio, this court is left with the impression, barring allegations to the

contrary, that Defendant Daughtry simply left the prosecution summary and disclosure of materials procedures alone and he had no indication of violations, leaving no basis from which to conclude that his acts in this respect comprised a constitutional violation. Consequently, if Defendant Daughtry's supervisory acts were not a clear violation of rights, despite the fact that Plaintiff's rights were in fact allegedly violated by another, different, individual, Defendant Daughtry is entitled to qualified immunity with respect to Plaintiff's allegations in Count III regarding exculpatory and impeachment materials under Brady and Giglio.

Plaintiff further alleges that Defendant Daughtry's supervisory failings implicated "the appropriate use of informants and information provided to detectives by informants" and that the detectives would take "reasonable steps to test the credibility of information received from informants[.]" (Compl. (Doc. 1) ¶¶ 196, 198-99.) Plaintiff entitles Section F of his Complaint, "The Greensboro Police Had a Policy and Practice of Relying On Informants Regardless of Their Credibility." (Id. at 23.) He conclusorily alleges that "the GPD maintained an improper and unconstitutional custom, policy and practice of actively encouraging detectives to rely upon information from informants without regard to whether those informants were

-45-

reliable or their information was truthful, and of condoning such conduct when it occurred." (Id. ¶ 78.) The factual tie alleged between his conclusion – the custom, policy, and practice of relying on information on informants without regard to truthfulness – is merely the existence of "a large board on the wall at the police station to keep track of the number of informants each detective cultivated[,]" that did not discriminate with regard to the reliability of the informants. (Id. ¶ 79.) Beyond this specific factual allegation, the other tie is that the "GPD detectives and supervisors, including defendant Daughtry, knew or reasonably should have known" that GPD informants frequently came up with stories, largely through the newspaper accounts of crimes, to exchange for monetary reward or favorable treatment by the GPD. (Id. ¶ 83.) Based on these two, rather flimsy, factual allegations as ties, Plaintiff goes on to allege that Defendant Daughtry "either knew, or . . . should have known, that GPD detectives and officers were improperly cultivating and employing informants in the course of their investigations . . . ." (Id. ¶ 84.)

An officer is not entitled to qualified immunity if he has violated a clearly established constitutional right. See Pearson, 555 U.S. at 232. However, if there is no tie between his conduct and a constitutional violation, the predicate

-46-

element of causation between his conduct and the violation is
necessarily missing. Here, the GPD has not been alleged to be a
monolithic entity, with the act of each of the parts
attributable to the whole or to the head. Defendant Daughtry
served as the police chief and there are indeed allegations that
he or his policies supported the broad gathering of informants,
perhaps indiscriminately. However, beyond that, there is no
allegation tying the cultivation of informants generally to the
use of questionable informants specifically for warrant and
prosecution purposes.[10] It is this link that Plaintiff has
alleged in a conclusory manner at best and without sufficient
facts to make it a plausible, rather than a possible,
contention. There is no indication that Defendant Daughtry acted
in a way to violate Plaintiff's constitutional rights, and thus,
even if the allegations did not fail under Rule 12(b)(6), on the
present allegations, he likely would be entitled to qualified
immunity as to this aspect of Count III as well.

Given that Plaintiff's claims against Defendants Whitt and
Spagnola will largely proceed, there is the potential that
during discovery with those defendants, and not a mere fishing
expedition, Plaintiff will uncover evidence specifically tying

---

[10] There are no allegations of this sort beyond, as is
alleged, in Plaintiff's own criminal case. (<u>See</u> Compl. (Doc. 1)
¶¶ 97-100.)

to Defendant Daughtry and establishing the missing link here.
For all of these reasons, this court will dismiss Count III
against Defendant Daughtry in his individual capacity, but, the
dismissal against Defendant Daughtry in his individual capacity,
as based on his supervisory liability, will be without
prejudice. However, this court cautions that baring some sort of
link sufficient to overcome qualified immunity, it is unlikely
that a future claim against Defendant Daughtry would stand.

### D. __Count IV Against Defendant City of Greensboro__

Plaintiff contends that the City of Greensboro is liable
because "Defendant Daughtry ha[d] final policymaking authority
for the GPD and . . . City of Greensboro with respect to law
enforcement and criminal investigations[.]" (Compl. (Doc. 1)
¶ 205.) He argues that the "delegation of law enforcement
authority to the Chief of Police is reflected throughout the
City Charter and Code," (Pl.'s Resp. to Counts III and IV (Doc.
27) at 17), and that language indicating that the Chief acts
"under" the City Manager at most "indicates that the City
Charter delegates the authority of the City Manager to the Chief
of Police for the purpose of supervising the police." (Id. at 19
(emphasis removed).) Defendants argue that (1) "Plaintiff has
not alleged any improper decisions by Daughtry" and (2) "the GPD
Chief is not a final policymaker for purposes of Section 1983."

-48-

(Greensboro and Daughtry's Br. (Doc. 19) at 21.) They argue
further that "Plaintiff does not allege a delegation of final
policymaking authority," (Greensboro and Daughtry's Reply Br.
(Doc. 32) at 19), and thus the Complaint is insufficient on its
face. (See id. at 21-22.) Finally, they assert that "the City
Charter confirms that the City Manager is the final policymaker
in Greensboro." (Id. at 22.)

Municipalities cannot be held vicariously liable under
§ 1983 solely on a respondeat superior theory. Monell v. Dep't
of Soc. Servs., 436 U.S. 658, 691 (1978).  For a municipality to
be liable under § 1983, the constitutional deprivation must be
caused "through an official policy or custom." Lytle v. Doyle,
326 F.3d 463, 471 (4th Cir. 2003) (citation omitted); see also
Monell, 436 U.S. at 692 ("[Section 1983] plainly imposes
liability on a government that, under color of some official
policy, 'causes' an employee to violate another's constitutional

rights.").[11] In general, "'official policy' often refers to formal rules or understandings — often but not always committed to writing — that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480-81 (1986) (holding also that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances").

There are four ways these policies or customs can arise:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

<u>Lytle</u>, 326 F.3d at 471 (citation omitted).

---

[11] As for the basic requirements of a § 1983 claim, plaintiffs

> must show [or, at this stage, allege] that (1) they were deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law. . . . However, not every deprivation of a constitutional right will lead to municipal liability. Only in cases where the municipality causes the deprivation "through an official policy or custom" will liability attach.

<u>Lytle</u>, 326 F.3d at 471 (citations omitted).

The Fourth Circuit explains further:

"Policy" in this context implies most obviously and narrowly a "course of action consciously chosen from among various alternatives" respecting basic governmental functions, as opposed to episodic exercises of discretion in the operational details of government. Correspondingly, "policymaking authority" implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.

Spell, 824 F.2d at 1386 (citations omitted); cf. id. ("The most critical factor is not the practical finality of an official's 'acts and edicts,' but their 'policy' nature." (citation omitted)). The basic standard is that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481. Because the inquiry is "one of authority-in-fact," "[a] municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker." Spell, 824 F.2d at 1386 (citations omitted).

It is possible that "policymaking responsibility is shared among more than one official or body." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988). While delegation is a way for officials to share responsibility while still holding the municipality responsible under § 1983, see id. at 125-26, the

-51-

Supreme Court cautions that "the mere exercise of discretion by an employee" is insufficient to establish municipal liability. Id. at 126-27 (finding that otherwise it "would be indistinguishable from respondeat superior liability"); see also Pembaur, 475 U.S. at 481-82. Based on the need to balance the reality of shared authority in many local governments with the need to avoid vicarious liability via respondeat superior, with respect to official actions by policymakers, "municipal liability under § 1983 attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483-84. Thus, "[w]hen a municipal official's discretionary action 'is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.'" Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (citation omitted). Courts must delineate between mere policymaking and final policymaking authority because liability only attaches to final policymaking authority. See id. at 523-24.[12]

---

[12] In Riddick v. School Board of City of Portsmouth, 238 F.3d 518 (4th Cir. 2000), the Fourth Circuit cited the lower

"[T]he identification of policymaking officials is a
question of state law." <u>Praprotnik</u>, 485 U.S. at 124-25 ("[W]e
can be confident that state law (which may include valid local
ordinances and regulations) will always direct a court to some
official or body that has the responsibility for making law or
setting policy in any given area of a local government's
business."). "[T]o determine which officials possess final
policymaking authority for the allegedly unconstitutional action
in question, we must look to 'the relevant legal materials,
including state and local positive law, as well as "custom or
usage having the force of law."'" <u>Riddick</u>, 238 F.3d at 523
(citations omitted). Plaintiff and Defendants further disagree,
however, as to the standard of when a police chief is deemed to
have final policymaking authority.

---

court to illustrate the distinction between policymaking
authority and final policymaking authority:

> [T]he key is the <u>final</u> policy making. The key here is
> final. It is not just policy making, the school board
> can say to the superintendent, develop a policy. But
> that policy still then has to be approved by the
> school board. In other words, it is not just who can
> make policy . . . . [I]t is ultimately in the scheme
> of things who has the final say-so.

<u>Id.</u> at 524 (citation omitted) (alterations in original). The
court then concluded that "[b]ecause the Board retained the
final 'say-so' on personnel matters, Judge Smith correctly
concluded that the Board cannot be subjected to municipal
liability based on the decisions of the superintendent and
principal." <u>Id.</u>

Plaintiff advances Barnett v. Karpinos, 119 N.C. App. 719, 460 S.E.2d 208 (1995), as illustrative of when North Carolina law deems a Chief of Police to be a municipal policymaker. (See Pl.'s Resp. to Counts III and IV (Doc. 27) at 15-16.) Barnett involved the Town of Chapel Hill and its police department: "Chapel Hill law enforcement policy is developed by the police chief who '[r]ecommends and enforces departmental policies, rules, and regulations . . . [and] determines practices and methods to be used by departmental personnel in consultation with the Town Manager.'" Barnett, 119 N.C. App. at 724, 460 S.E.2d at 211. Factually, the court noted that "[The Police Chief] kept the Town Manager abreast of the situation and how it was being handled. When asked what the Town Manager said about the planned operation, [the Chief] stated 'I venture to say he just listened and said okay.'" Id. at 725, 460 S.E.2d at 211. In that context, the court found sufficient evidence to defeat the defendants' summary judgment motion. Id.

Defendants put forth two Middle District cases finding that the Greensboro police chief did not have final policymaking authority: Alexander v. City of Greensboro, 762 F. Supp. 2d 764 (M.D.N.C. 2011), and Fulmore v. City of Greensboro, 834 F. Supp. 2d 396 (M.D.N.C. 2011). Plaintiff, in response, argues "to the extent that Alexander and Fulmore find that the Greensboro Chief

-54-

of Police does not have policymaking authority with regard to the conduct of police investigations, those decisions are inconsistent with Monell, Pembaur, Spell and Barnett, and should not be adopted by this court." (Pl.'s Resp. to Counts III and IV (Doc. 27) at 19 & n.4 (seeking also to distinguish these cases on their facts).)

Alexander v. City of Greensboro involved a suit by black police officers who worked for the Greensboro Police Department. 762 F. Supp. 2d at 776. The court cited the Fourth Circuit's holding in Greensboro Professional Fire Fighters Association, Local 3157 v. City of Greensboro, 64 F.3d 962 (4th Cir. 1995), "that under the Greensboro City Ordinance 'only the City Manager and the City Council possess the authority to fashion policy with regard to employer-employee relations in all city departments.'" Alexander, 762 F. Supp. 2d at 782 (citing Greensboro Prof'l Fire Fighters Ass'n, 64 F.3d at 965). It also cited the warning "against confusing 'the authority to make final policy with the authority to make final implementing decisions.'" Id. (citations omitted). The court determined that, while it alleged the power to make operating decisions, the complaint "containe[d] no factual allegations supporting a reasonable inference that this power rose to the level of municipal 'policymaking,'" beyond repeated "bare assertion[s]"

that the defendants had final policymaking authority. Id.
(observing also that "there is no allegation that the Greensboro
City Council or City Manager delegated final policymaking
authority over employer-employee relations to [the
defendants]"). Further, the court determined that the defendants
lacked final policymaking authority where "the Greensboro City
Charter . . . provides in part: 'The chief of police, acting
under the city manager, shall have supervision and control of
the police force,'" because "[i]f an official's acts are subject
to review or supervision by a municipal policymaker, that
official does not have final policymaking authority." Id. at 783
(citations omitted).

Fulmore v. City of Greensboro also involved a black police
officer's suit against the Greensboro Police Department and
related defendants. 834 F. Supp. 2d at 402. The court's analysis
and holding tracked closely to Alexander. See id. at 406-07. In
rejecting an argument that final policymaking authority had been
delegated, the court observed that, despite the fact that
evidence establishing delegation is not required at this stage,
a plaintiff nevertheless "must allege facts plausibly indicating
that such delegation took place." Id. at 407 (citation omitted).
Further, in addressing the argument that Greensboro Professional
Fire Fighters Association is limited to employment decisions,

-56-

the court emphasized that the allegations failed to point to any "statute, ordinance, or regulation bestowing final policymaking authority upon the GPD Chief or Deputy Chief in connection with any of the non-employment-related matters alleged, nor [did the plaintiff] allege any specific facts indicating that such authority was delegated to [the defendants]." Id. at 408. The court concluded by reiterating that the argument was "also contrary to the Greensboro City Charter which, as noted in Alexander, provides in part: 'The chief of police, acting under the city manager, shall have supervision and control of the police force and shall enforce discipline therein.'" Id. (citation omitted). Thus, the complaint "failed to plausibly allege a municipal policy" for purposes of the § 1983 claim. Id.

By contrast, in Spell,[13] the Police Chief was an authorized policymaker via "formal delegation of the City's governing body." Spell, 824 F.2d at 1395. There, the court noted that

> [i]f the agency and the city manager possessed exclusive authority in the critical matters here in issue, the evidence clearly established that it was only a paper, formal authority, never effectively exercised before [the plaintiff's] injury to curb or countermand the authority in fact being exercised by

---

[13] Spell is a Fourth Circuit decision with respect to 42 U.S.C. § 1983 that occurred after the plaintiff, Spell, had two trials against the City of Fayetteville and a City police officer for physical injuries he received while in custody. 824 F.2d at 1383. The question of policymaking authority arose in context of the court's discussion of the City of Fayetteville's municipal liability. Id. at 1395-99 (in verdict form context).

[the Chief] and his subordinates in the police
department. . . . [M]unicipal liability may not be
avoided by such purely formal reservations of "final"
authority.

Id. at 1397 (addressing an argument about the verdict submission

form). When testimony established that the Chief took on his

policymaking role and no evidence existed showing that his role

or authority had ever, in fact, been checked by the City

Manager, despite the paper reservation of authority, id. at

1394-95, Spell determined that actual policymaking authority

rested with the police department, not the city manager. Id. at

1397. Thus, while final authority is a key factor, it must be

true final authority, rather than pro forma, to avoid incurring

municipal liability.[14]

    In this case, Plaintiff argues that the Chief of Police is

a delegated municipal policymaker with respect to law

enforcement authority. (See, e.g., Pl.'s Resp. to Counts III and

IV (Doc. 27) at 17.) While the City of Greensboro cannot use a

reservation of final authority to the City Manager as a

procedural quirk to avoid municipal liability, any final

---

    [14] Additionally, to the extent Alexander and Fulmore may
arguably be distinguished on their facts from the case at hand,
as those two cases addressed employer-employee matters, the
contrast with Spell shows that the requirement that an
individual have actual policymaking authority is meaningful, and
thus these cases are, at the least, illustrative of situations
where authority is insufficient, despite partial delegation. See
Alexander, 762 F. Supp. 2d at 783; Fulmore, 834 F. Supp. 2d at
408.

policymaking authority delegated to another actor, such as the
Chief, must be true final policymaking authority, rather than
mere policymaking authority or general decision-making or
implementation authority. As argued by Defendants, the phrase
"in consultation with," from Barnett, implies a more cooperative
process than that envisioned by the Greensboro City Charter,
which uses the phrase "acting under the city manager."
Greensboro, N.C., Charter ch. IV, subch. A, art. 4, § 4.31
(1967); see also Barnett, 119 N.C. App. at 724, 460 S.E.2d at
211; (Greensboro and Daughtry's Reply (Doc. 32) at 20.) Further,
Plaintiff failed to allege facts plausibly indicating that a
delegation took place. Therefore, because this court does not
find that Defendant Daughtry held final policymaking authority,
Count IV will be dismissed without prejudice.[15]

---

[15] This court notes the quandary of dismissing the official
capacity claim against Defendant Daughtry as duplicative of
Plaintiff's claim against Defendant City of Greensboro and,
then, dismissing the claim against Defendant City of Greensboro
as well. While initially perplexing, the rationale is as
follows: as explained above, a suit against Defendant Daughtry
in his official capacity is in fact a suit against the
municipality and thus appropriately dismissed as duplicative.
The issues with the suit against Defendant City of Greensboro
derive from the failure allege an official policy as delineated
in the four options under Lytle. 326 F.3d at 471 (citations
omitted). For example, Plaintiff could have alleged sufficient
factual grounds of a delegation of final policymaking authority
to Defendant Daughtry (Plaintiff's existing conclusory
allegations fail for the reasons examined, supra) or alleged a
link between the City Manager, as the final policymaker, and the
policy or policies that led to constitutional injuries,

IV.  <u>**CONCLUSION**</u>

For the reasons stated herein,

**IT IS THEREFORE ORDERED** that Defendants City of Greensboro and Daughtry's motion to dismiss (Doc. 18) is **GRANTED IN PART** and Counts III and IV are **DISMISSED WITHOUT PREJUDICE** and **DENIED IN PART** with respect to Defendants' arguments concerning the release.

---

rendering them official policies and sufficient to hold the City liable. Because there are potential sets of facts, which may perhaps be unearthed during discovery, that could lead to such allegations, this court will designate the dismissal of Count IV as without prejudice.

This the 6th day of June, 2016.

_____
                United States District Judge